In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 05-4616 & 05-4617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HUGH WILLIS and VICTOR TROUT,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 01 CR 676-1 & 01 CR 676-3—**John F. Grady**, *Judge.*

_____

ARGUED NOVEMBER 30, 2007—DECIDED APRIL 23, 2008

_____

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge.* On December 19, 2000, a ship-
ment of 1300 Sony digital cameras disappeared from
O'Hare International Airport soon after arriving on an
American Airlines flight from Japan. After an investiga-
tion resulted in confessions from two American Airlines
employees—defendants Hugh Willis and Victor Trout—the
United States charged them both with stealing and con-
spiring to steal a foreign shipment. A jury convicted Trout
of conspiracy but acquitted him of the theft charge, result-
ing in twenty-seven months' imprisonment. Another

jury convicted Willis on both counts, earning him forty-one
months' imprisonment. These appeals followed, raising
a number of issues concerning the administration of the
trials and one related to sentencing. For the reasons set
out below, we affirm Trout's and Willis's convictions,
but vacate Willis's sentence and remand for resentencing.

## I.  Background

On the afternoon of December 18, 2000, a shipment of
1300 Sony digital cameras arrived at O'Hare International
Airport on an American Airlines flight. The shipment
came from Japan, and Nippon Express was supposed to be
pick it up the next day. But when Nippon Express came to
get it, the cameras, all $690,885 worth, were gone. Under-
standably put out by the loss, Nippon Express contacted
American Airlines who, in turn, contacted the Chicago
Police Department to investigate.

The investigation soon bore fruit. On the night of the
disappearance, an American Airlines employee, Rosarito
Solomon, had come upon three individuals—Hugh Willis,
a man named Mark Patterson, and an unidentified man
in a ski mask—taking apart what appeared to be a ship-
ment of cameras. Their behavior was suspicious for a
number of reasons. Willis told Solomon that they were
breaking down the shipment because it had been crushed
en route to London, but the men hadn't filled out a damage
report as required. Also, the men were working outside
and shipments were typically broken down indoors. And
based on the tracking number for the shipment, the
contents were supposed to stay in Chicago, not move on to
London as Willis had said. Over the next few days, cam-
eras started to turn up in strange places around the air-

port; three were found in the back of a luggage tug and another one showed up in a misplaced cart behind a privacy fence.

On December 22, 2000, Chicago detectives Milorad Sofrenovic and Stephan Combes interviewed Willis about the lost cameras. At first, Willis denied any knowledge. But based on what Sofrenovic already knew about Willis's involvement, he arrested him anyway. Willis soon confessed, first verbally then in writing. As he recounted it, the heist was a straightforward one. Willis said that when the shipment arrived, he decided to steal it, thinking the shipment consisted of camcorders. So he, Patterson, and Trout began breaking down the load of cameras and putting them into freight cars. Trout then took the shipment out of the cargo area, and later that night, the men divvied up the cameras, eventually taking them off-site and selling them. Willis would receive $1500 for his lot of the cameras.

A few days later, Trout confessed to Officers Sofrenovic and Combes as well. He said that Willis had called him on December 18 to ask if he wanted to make some extra money, but Trout was noncommital. Later, Patterson called asking if Trout would move the load of cameras. Trout agreed and moved the cameras with the understanding that he would be paid after they were sold; he said he would've been happy to receive $200 for his time. Circumstantial evidence made Trout's involvement plausible. He was at work but unaccounted for from 4 P.M. on December 18 until 2 A.M. on December 19—the time of the robbery. And he had access to the luggage tug in which the three misplaced cameras were found.

In light of this evidence and their confessions, indictments were forthcoming for both Trout and Willis, charg-

ing them with stealing a foreign freight shipment in violation of 18 U.S.C. §§ 659 & 2 and conspiring to do so in violation of 18 U.S.C. § 371. A jury acquitted Trout of the actual theft, but convicted him of conspiracy, resulting in twenty-seven months' imprisonment. A separate jury convicted Willis on both counts, and the judge sentenced him to forty-one months' imprisonment. In reaching this sentence, the court found that Willis had perjured himself on two separate occasions and added two, two-level obstruction-of-justice enhancements. These appeals followed.

## II. Discussion

Together, Willis and Trout raise five issues on appeal, four of which concern the administration of the trial and one that concerns sentencing. Willis challenges the government's use of a peremptory strike against the only African-American venireperson and the district court's imposition of two obstruction-of-justice enhancements in calculating his sentence. In his appeal, Trout submits that the government both committed prosecutorial misconduct by objecting during his attorney's closing argument and improperly commented on his decision not to testify at trial. He also claims that the district court improperly handled a jury note sent out during deliberation. We discuss each issue in turn, providing additional facts as necessary.

### A. Willis's Appeal

#### 1. *Batson* Claim

On appeal, Willis claims that the dismissal of the only African-American venireperson constituted a *Batson* viola-

tion. Of the forty people called in the venire for Willis's trial, only one—Juror No. 1—was African American. After a recess between voir dire and the selection of the jurors for trial, the government asked the court if it could pose a few more questions to Juror No. 1. She had recently moved from being the manager of a fast-food restaurant to the ranks of the unemployed. The government doubted that a person would voluntarily reduce her income from a managerial salary to unemployment benefits. And the government's attorneys wondered if theft or misconduct precipitated the move, potentially fomenting "animosity towards people in authority" and ostensibly biasing her against the government's case. Because she was the only African-American juror, the government did not want to immediately strike her. So it proposed asking her a few more questions to clear up her employment history instead.

Willis's attorney characterized the government's motivations less charitably. He responded to the government's request by voicing his "concern . . . that the government [wa]s hunting . . . for . . . some independent reason" to strike the "single African-American individual." The court ultimately denied the government's request for more questioning. But because it considered the government's concerns to be "real" and "reasonable," it said that it would be "within [the government's] rights to excuse her . . . on a peremptory challenge." He told Willis's attorney that he could "make a *Batson* objection, but [he didn't] think it would be well taken." After the court made its decision, Willis's attorney said that he "wanted to note for the record the action of the government striking Juror No. 1, . . . the only African-American in the entire 40-member venire." The court recognized his concern, but said that it could not "require the govern-

ment to take a juror that it would not otherwise take just because that juror happens to be black."

The Equal Protection Clause of the Fourteenth Amendment prohibits a party from dismissing a potential juror because of that juror's race, *Batson v. Kentucky*, 476 U.S. 79 (1986), a prohibition that applies to the federal government as a feature of due process. *Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281, 1282 n.4 (7th Cir. 1990). Courts preserve this substantive right through a three-part procedural device: (1) if an objecting party makes out a prima facie showing that the opposing party has dismissed a potential juror for impermissible reasons, (2) the burden shifts to the opposing party to articulate a non-discriminatory reason for the dismissal, (3) after which the district court must determine whether this reason is deserving of belief and whether the objecting party has proved an equal protection violation. *Batson*, 476 U.S. at 97-98.

Were the government's concerns over Juror No. 1's employment history the actual reason for dismissing her? The parties dispute how much deference we should give the district court's affirmative answer to this question. In the government's estimation, Willis forfeited this claim by never raising a proper *Batson* challenge in the district court, meaning we would only review the decision for plain error and will only reverse if "a discriminatory intent is inherent in the prosecutor's explanation." *United States v. Chandler*, 12 F.3d 1427, 1432 (7th Cir. 1994). Willis on the other hand argues that he preserved his *Batson* claim below, which would entitle him to de novo review as to his prima facie case, *see Mahaffey v. Page*, 162 F.3d 481, 484 (7th Cir. 1998), but a clear error standard of review with respect to discriminatory intent. *United States v. Jones*, 224 F.3d 621, 624 (7th Cir. 2000).

In light of the record below, Willis did not forfeit his *Batson* claim. A *Batson* inquiry is very specific: is a party trying to eliminate a potential juror because of that person's race or gender? The answer to this question most often hinges on the credibility of the race-neutral reason put forth to strike the venireperson. *Batson*, 476 U.S. at 98 n.21. And evaluating the believability of the proffered reason turns on the constellation of facts surrounding the case and the voir dire—an evaluation better made by the district court. *Id.* When a party simply objects to the opposing party's use of a peremptory challenge, the court has no reason to evaluate whether the reason for dismissal was instead a pretext for discrimination; the party could have eliminated the venireperson for any reason, good or bad. As a practical matter then, this Court can only find a *Batson* violation articulated for the first time on appeal if the discrimination is plain on the face of the party's justification in the district court, and so the standard of review is plain error. But where the prosecutor gives a race-neutral reason for dismissal to fend off a *Batson* claim in advance, a different situation arises. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991). The district court's and the parties' focus are squarely on the question of discrimination, permitting a fulsome analysis of the relevant facts surrounding the peremptory strike and permitting a slightly more probing standard of review by this Court.

That is what happened in the district court. The court evaluated and credited the government's non-discriminatory reasons for dismissing Juror No. 1 in light of an accusation—first potential, then actual—that the government dismissed her because of her race. The government prefaced its request for additional questioning with the observation that its concerns were "in line with

what [Willis's attorney] want[ed] to talk to you about . . . .
It's obvious there's only one African-American juror on
the venire." And the government's attorney said that he,
"as an individual, did not want to strike the only African-
American prospective juror." In addition, Willis's attorney
accused the government of "hunting . . . for some . . .
independent reason" to strike Juror No. 1, whom he
called the "single African-American individual" in the
venire. And after the court's decision, he renewed his
objection to the dismissal of Juror No. 1, "for the record,
the only African-American in the entire 40-member
venire." Finally, the court characterized the government's
concerns as "real" and "reasonable," and it added that
"putting myself in the position of the prosecutor in this
case, I'd have the same concerns." The court also "kn[e]w
that this juror would not be excused by the government
because of her race." And although the court said it
would "listen to [Willis's attorney] if he want[ed] to raise
a *Batson* objection," the court did not "think it would be
well taken." Although the treatment of the issues was not
ordered as *Batson* would have it, this colloquy suffices
to preserve Willis's *Batson* claim for review.

   Despite the standard of review, these facts are insuffi-
cient to show a *Batson* violation. The issue on appeal is
solely whether the government's non-discriminatory
reason was valid and worthy of belief. It's unnecessary
to determine whether Juror No. 1's dismissal sufficed to
establish Willis's prima facie case. The government gave
its race-neutral justification for striking Juror No. 1, and
the trial judge ruled that this reason was not a pretext
for discrimination. So the "issue of whether [Willis] has
established a prima facie case is moot." *United States v.
Jones*, 224 F.3d 621, 624 (7th Cir. 2000).

Nonetheless, the government offered a valid reason for striking Juror No. 1, and there is no indication that the district court erred in crediting these reasons as the "real" reasons for dismissal. To survive a *Batson* challenge, the reason offered by a party for its use of a peremptory challenge doesn't have to be an objectively good one; it just can't be race or gender and it must be the actual reason motivating the party. *United States v. Brown*, 34 F.3d 569, 571 (7th Cir. 1994). The jury in this case would ultimately be impaneled to decide whether Willis stole from his employer for personal gain. Although it was by no means inevitable, it was not unduly speculative to think that Juror No. 1 may not have left her manager-level job voluntarily to become unemployed. A juror who potentially harbored animosity towards a former employer may have been, in the government's eyes, a bit too sympathetic to a defendant charged with theft from an employer. This may not have supported a dismissal for cause, but "under the American legal system counsel for both parties have a limited number of peremptory strikes to use according to their individual intuitions regarding jurors." *Brown*, 34 F.3d at 571. And when viewed in its entirety, the government's statements to the court reveal a sensitivity to the dismissal of the only African-American juror rather than racial animus. Accordingly, Willis's *Batson* claim must fail.

### 2. Obstruction-of-Justice Enhancements

Willis also challenges the district court's imposition of two obstruction-of-justice enhancements for two separate incidents of perjury. For his convictions, Willis's base offense level was four and the court added on twelve levels because of the high market value of the 1300 stolen

digital cameras. The district court then added two more two-level enhancements for acts of perjury that Willis committed during a pre-trial suppression hearing and during trial itself. The court thought that it would be a "bad message to send" if a single two-level increase applied for two distinct acts of perjury, so the court added four more levels for a total offense level of twenty. This set the Guidelines range at thirty-three to forty-one months' imprisonment, and the district court ultimately settled on the maximum, a forty-one-month sentence. The government conceded that this was error on appeal, a conclusion unswayed even after this Court requested supplemental briefing on the treatment of analogous adjustments under the Guidelines.

The issue is whether the district court erred in adding two obstruction-of-justice enhancements for two distinct acts of perjury, meaning that the point of departure before application of 18 U.S.C. § 3553(a) should have been an offense level of eighteen rather than twenty. The text and commentary of § 3C1.1 do not provide much help. Section 3C1.1 of the Sentencing Guidelines provides that a district court should "increase the offense level by 2 levels":

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense. . . .

U.S.S.G. § 3C1.1 (2005). The behavior justifying the enhancement—"obstructive conduct"—is susceptible to either a broad or a narrow reading; the meaning of the term

"conduct" can range from an "act" or "manner" to a "process of carrying out." WEBSTER'S THIRD NEW INTERNATIONAL 473 (1981). As a result, one could—as the district court did—read the "obstructive conduct" punished by § 3C1.1. to consist of a single "act" of obstruction, justifying a separate enhancement for each obstructive act. Or, as the parties argue, the enhancement could apply once; a sentencing switch that is either on or off such that the enhancement applies to the entire "process of carrying out" the obstruction. Section 3C1.1 does not point to the appropriate reading, and this creates an ambiguity.

But the text and commentary of other adjustments provide more explicit guidance. Section 3C1.1 is one of at least nineteen different adjustments in chapter three of the Sentencing Guidelines. These provisions all provide broadly applicable modifications to the base offense level for "real offense elements"—circumstances of the crime or of the defendant that apply to some or all criminal offenses. *See* U.S.S.G. § 1A1.1 ed. n.4(a); ch.3 introductory cmt. For three of these adjustments, the Sentencing Commission has provided explicit guidance on how to calculate the offense level when a defendant has committed multiple acts supporting the same adjustment. Section 3B1.4 provides a two-level adjustment if "the defendant used or attempted to use a person less than eighteen years of age to commit the offense." U.S.S.G. § 3B1.4. Just as a defendant can perjure himself on more than one occasion, he can employ more than one minor in committing an offense. If that's the case, rather than call for multiple two-level enhancements under § 3B1.4, "an upward departure may be warranted." U.S.S.G. § 3B1.4 cmt. n.3. Similarly, § 3C1.2 provides a two-level enhancement when the defendant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of

fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. When "the conduct posed a substantial risk of death or bodily injury to more than one person, an upward departure may be warranted." *Id.* at cmt. n.6. Finally, § 3A1.1 provides for a two-level enhancement where the "defendant knew . . . that a victim of the offense was a vulnerable victim," whereas if a "large number of vulnerable victims" were involved, this provision calls for a three-level adjustment. U.S.S.G. § 3A1.1(b)(2).

These three sections make it clear that a sentencing court should not apply the obstruction-of-justice adjustment more than once for multiple acts of obstruction. Where a particular adjustment expressly provides for a higher offense level for multiple acts, as with § 3A1.1's treatment of a "large number of vulnerable victims," it is not through multiple applications of the enhancement for each act calling for an adjustment. And where there is no express numerical increase in the offense level for multiple acts, the commentary indicates that a departure may be warranted. But no other provision in chapter three calls for the use of multiple adjustments for multiple acts, and given that these provisions provide the same type of adjustment to the defendant's base offense level, they should apply in a consistent manner. Thus, consistent with the commentary in §§ 3B1.4 and 3C1.2, we hold that multiple acts of perjury produce a single two-level enhancement under § 3C1.1 and possibly a higher or above-Guidelines sentence based on the discretion conferred by 18 U.S.C. § 3553(a), not the imposition of multiple obstruction-of-justice enhancements.

In a sense, this conclusion is largely procedural and does not substantively alter a district court's ability to deal with a serial perjurer. The Sentencing Guidelines are

famously advisory, and the district court has sub-stantial discretion in choosing a reasonable sentence; a discretion that includes consideration of multiple acts of obstruction. But before this discretion kicks in, the district court must first properly calculate the advisory Guidelines range, *United States v. Elliot*, 467 F.3d 688, 691 (7th Cir. 2006), and to do so means that the court should only apply the obstruction-of-justice enhancement once. Although this Court hasn't plumbed the complexities of this issue before, our approach in previous cases has been consistent. *See, e.g.*, *United States v. Huerta*, 239 F.3d 865, 870 (7th Cir. 2001); *United States v. Furkin*, 119 F.3d 1276, 1283-84 (7th Cir. 1997). And other circuits have reached a similar conclusion. *See, e.g.*, *United States v. Ventura*, 146 F.3d 91, 97 (2d Cir. 1998); *United States v. Clements*, 73 F.3d 1330, 1342 (5th Cir. 1996); *United States v. Vaught*, 133 Fed. Appx. 229, 235 (6th Cir. 2005); *United States v. Fields*, 963 F.2d 105, 109 (6th Cir. 1992). Accord-ingly, the district court erred in applying multiple two-level enhancements for Willis's perjury. Instead, it should have analyzed the additional act of perjury as a basis for a higher or non-Guidelines sentence under the factors listed in 18 U.S.C. § 3553(a).

## B. Trout's Appeal

### 1. Prosecutorial Misconduct

Trout argues that the government committed prosecuto-rial misconduct by objecting during his attorney's closing argument. Prior to his arrest, Trout had confessed to Chicago police officers Sofrenovic and Combes. When Officer Combes testified, he relied on the notes that he took during Trout's interview to remember the specifics

of what they had discussed, although the notes them-selves were inadmissible hearsay. During his closing argument, Trout's attorney characterized the government's case as "boil[ing] down to . . . this statement that they claim that Mr. Trout made." He characterized Officer Combes as a "nice guy" who "knows nothing"and ques-tioned his reliance on his notes, which were, in his estima-tion, of dubious value. Trout's attorney continued,

> [T]here is something wrong here with a case in which the government really only has some handwritten notes which you don't even get to hold in your hands or look at, that say that the defendant is guilty and that he admitted it. And then these very—

At this point, the government objected, saying that it had "no objection to the notes going back." After a brief collo-quy between the government and the court, Trout's attorney objected himself, stating that the government was "interrupting my closing argument in an improper way." The court sustained Trout's attorney's objection, calling the "interruption . . . not warranted," and the closing argument continued uninterrupted.

Almost immediately after the jury began deliberating, it sent out its first note:

> Dear Judge, can we see a written copy of the defen-dant's statement to the police, even an edited copy? We know the notes of the [sic] Detective Combes are not considered evidence, but can we see a copy of his statement from the arrest report or from the supple-mental report prepared by the detectives on the case? Sincerely, the jury.

The judge called the jury into court and explained that the desired evidence was inadmissible hearsay. The

court continued: it was regrettable that the jury did "not have all the information [it] would like to have but . . . this is frequently the situation in trials where evidence that might be interesting or even relevant is for one reason or another excluded from consideration." The "trier of fact . . . has to get along without it."

After the court sent the jury back to resume deliberations, the government expressed its concern that the court's statement might have given the jury the impression that Combes's testimony regarding Trout's statement was "something they almost can't consider." Concerned that it had "misled them into thinking they can't rely on their recollection," the court called the jurors back in and told them that they "must rely on [their] recollection unassisted by the materials" requested of the court. After the jury resumed deliberating, Trout's attorney filed a motion for a new trial or for a curative instruction. He cited the government's objection during his closing argument and he claimed that the court emphasized the notes in its remarks to the jury. The court denied the motion, and after a few more notes to the court (two of which are discussed in the final section below), the jury convicted Trout.

On appeal, Trout argues that he was denied a fair trial by the government's objection during his closing argument and that the district court erred in failing to declare a mistrial. This Court evaluates prosecutorial misconduct that does not implicate an enumerated constitutional right to "determine whether [it] deprived the defendant of a fair trial." *United States v. Cotnam*, 88 F.3d 487, 498 (7th Cir. 1996). To make that determination, we first evaluate the objection in isolation, and if it was improper, we then examine the objection "in light of the

entire record to determine if the defendant was deprived of a fair trial." *Id.* We have identified five factors that are relevant in weighing the prejudice of the prosecutor's comments: "1) the nature and seriousness of the prosecutorial misconduct, 2) whether the prosecutor's statements were invited by impermissible conduct by defense counsel, 3) whether the trial court instructed the jury to disregard the statements, 4) whether the defense was able to counter the improper statements through rebuttal, and 5) the weight of the evidence against the defendant." *Id.*; *United States v. Rodriguez*, 63 F.3d 546, 558 (7th Cir. 1995). Trout raised this objection below in the context of a motion for a new trial, the denial of which we review for an abuse of discretion. *United States v. Humphrey*, 34 F.3d 551, 557 (7th Cir. 1994).

The government's decision to object during the defendant's closing argument is not unproblematic. Aside from disrupting the defendant's final chance to present his case to the jury, it was largely unnecessary. For a minor objection, which was the kind made here, the government can always use its rebuttal to correct any misstatement made by the defendant or, if the situation demanded, seek a curative instruction. But regardless whether the objection rose to the level of improper conduct, which we do not decide, Trout's trial was fair. In the first place, although the timing of the objection was not ideal, the defendant invited the response. *See Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986). Both sides knew that Officer Combes's notes were inadmissible hearsay. Nonetheless, Trout's attorney sought to use the fact of this inadmissibility to weaken the thrust of the testimony recounting his client's confession. In addition, the prejudice resulting from the objection was minimal. Trout argues that the objection improperly emphasized

Officer Combes's testimony regarding his confession. But Trout's closing argument—most notably, the remarks that precipitated the objection—largely focused on Officer Combes's testimony and his notes irrespective of the government's objection. And, later in his closing remarks, Trout's attorney impugned Officer Combes's testimony with the fact that he needed the notes to remember what had happened. Instead of attempting to lessen the alleged prejudice arising from the government's objection, which Trout's attorney had an opportunity to do, he continued to discuss the notes. Accordingly, the incremental weight placed on the notes by the government's objection was slight. Finally, the district court properly instructed the jury regarding how it must evaluate the evidence through its supplemental instructions. Although the jury note indicated some confusion regarding the evidence, the court's supplemental instructions were a proper statement of the law regarding the notes. So if the government's interjection caused any confusion, these instructions would have cleared it up. *Rodriguez*, 63 F.3d at 559. As a result, the government's objection could not have denied Trout a fair trial.

### 2. Improper Commentary on Trout's Failure to Testify

Trout also claims that the government impermissibly commented on his failure to testify during its rebuttal to his closing argument. During his own closing, Trout's attorney made much of the "immense passage of time" between the December 2000 robbery and the trial. In his estimation, the "case boils down to . . . this statement that [two police officers] claim Mr. Trout made." These officers had "no memory of what happened" and "simply read . . . what

happened four and a half years ago." These "obviously professional witnesses" could "avoid having their memory tested." And Officer Combes, whom Trout's attorney had "some more respect for," could not "remember anything, zero, zip." In closing, he remarked that he was "angry that this man is being put through this for four-and-a-half years based on a flimsy and completely unsupported claim that . . . he confessed to this crime," a confession that was before the jury based on the "completely evaporated memories of two police officers."

During its rebuttal, the government addressed the statements made by Trout's attorney:

> It should be clear to everyone here now that a very large part of our case centers on the statement, the confession, made by Mr. Trout. What I am befuddled by . . . is whether that statement has ever really been challenged. I mean, I was confused, I have to admit, by defense counsel's concession that Stephan Combes, the guy who wrote down the notes, who told you about what . . . Mr. Trout said, . . . is an honest guy.

> So in order for . . . us to disregard the confession, someone will have to have lied. Someone is lying about what was said by Mr. Trout. But there is really no challenge to the credibility of the officers. And you heard Detective Combes testify.

> * * *

> Now, on the one hand . . . he is challenging the memory of the police officers, as that somehow benefits the government. But think about it. If you have police officers who are going to lie, who are willing to break the law, who are going to try to frame someone, as

what's being suggested here although not said, then
why admit on the stand, I don't remember?

* * *

Now, what we have done is we have distracted you
now from the admissions that were made by Mr. Trout,
which are not being challenged. And that confession,
seals his fate.

Finally, the government concluded by noting that "the
heart of our case rests with the statement."

Trout argues that these statements indirectly com-
mented on his failure to testify, which, because his attor-
ney did not object in the district court, we review for
plain error. *United States v. Sandoval-Gomez*, 295 F.3d 757,
762 (7th Cir. 2002). To safeguard the defendant's Fifth
Amendment right against self-incrimination, the gov-
ernment cannot offer a defendant's failure to testify as
"substantive evidence of guilt," whether directly or
indirectly. *United States v. Robinson*, 485 U.S. 25, 34 (1988);
*United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996). In
a criminal trial, there may be times when it is "highly
unlikely that anyone other than the defendant could rebut
the evidence" offered by the government. *Freeman v. Lane*,
962 F.2d 1252, 1260 (7th Cir. 1992). In these circumstances,
a statement by the government that this evidence went
"uncontradicted" could, as a matter of logic, permit the
jury to draw a negative inference from the defendant's
failure to testify. Despite these limits, the Fifth Amendment
does not otherwise prevent the government from comment-
ing on the evidence adduced at trial. A "comment on the
'uncontradicted' or 'uncontroverted' evidence" is not
always reversible error "since the absence of contradiction
has evidentiary value, no matter who the logical person to

furnish the contradiction." *Kurina v. Thieret*, 853 F.2d 1409, 1416 (7th Cir. 1988). To separate the permissible from the impermissible, this Court looks to the context of the statements to decide whether (1) it was the prosecutor's "manifest intention" to use the defendant's silence as evidence of guilt; or (2) "the remark was of such a character that the jury would 'naturally and necessarily' " treat it as such. *Cotnam*, 88 F.3d at 497; *Robinson*, 485 U.S. at 33.

Trout cites the prosecution's use of the phrases "no challenge" and "not being challenged" as proof that the government indirectly commented on his decision not to testify. Trout only confessed to Officers Sofrenovic and Combes, and thus a statement that their testimony was "not challenged" would, in his estimation, necessarily point to his silence. These terms can produce constitutional violations when, "by default," the only person capable of "challenging" the government's claims was a non-testifying defendant. *See Cotnam*, 88 F.3d at 497.

But whether the government had the "manifest intention" to treat the defendant's silence as evidence of guilt depends on the context of the statement, not the government's use of certain proscribed terms. *Robinson*, 485 U.S. at 33. In light of the efforts by Trout's attorney to discredit Officer Combes in his closing, the government's statements cannot be read as a commentary on the defendant's failure to testify. It was instead an attempt to rehabilitate Officer Combes's credibility by focusing on "the accuracy and reasonableness of" his testimony, which is an entirely proper line of argument. *United States v. Harris*, 271 F.3d 690, 700-01 (7th Cir. 2001). In order to disregard his testimony entirely, the jury would have needed to conclude that Officer Combes was being less

than truthful or otherwise not worthy of belief. But, the government argued, no one had challenged his credibility. And despite Trout's attorney's argument that Officer Combes's memory was fuzzy, the government argued that there was no indication that he had provided bad information. Given the statements made by Trout's attorney, it was reasonable for the government to stress Officer Combes's credibility in its rebuttal, including an effort to stress the validity of his testimony. Because the jury would have seen the government's statements in this context, it would not have "naturally and necessarily" interpreted the government's argument to be a commentary on the defendant's silence.

### 3. District Court's Treatment of the Final Jury Notes

Finally, Trout argues that the district court improperly responded to a jury note indicating that the jury could not reach a verdict. The jury would ultimately send out four notes. Its third asked the court:

> Is it possible to convict on either count while finding the defendant innocent of the other? In other words, could we find the defendant guilty on Count 1 but not guilty on Count 2? Or is it impossible from a legal perspective to decide he's not guilty on Count 2 if we find him guilty on the conspiracy charge?

The court read the note to the parties and solicited responses. The government argued that a supplemental instruction was in order and agreed that the jury could reach different verdicts as to the two counts. Trout's attorney also agreed that "the instructions and the verdict forms make[ ] it clear that . . . there can be guilt on either side." The court then called the jury in, read the

jury's note, and gave an affirmative answer to all three questions posed in the note before the jury returned to its deliberations.

Later that afternoon, the jury sent its fourth note, informing the court that

> [H]aving discussed both of the charges and having tried to reconcile our differences of opinion without success, we wish to report to you our inability to reach a unanimous verdict on either count.

The court had provided the jurors an instruction prior to deliberations—a so-called *Silvern* instruction—informing them that they should make every effort to reach a unanimous verdict based on their deliberations and their honest beliefs regarding the facts from trial. After reading the jury's note to the parties, the court said that it saw "no point in repeating the *Silvern* instruction." Instead, it decided to "ask whether there is any juror who has any opinion that with further deliberation they could reach a verdict on either count." The court thought that "the answer [would] be no," but wanted to "take that final step" before discharging the jury. Neither party objected, and the judge brought in the jury and asked whether "any juror . . . has any belief that there is any prospect at all of a verdict on either count with further deliberation."

In response, one juror asked whether the court was "implying that [the jury] could come to a verdict on one count and then still not" convict on the other. The court said this would be permissible, and one juror responded that he'd like to continue deliberating. Another juror then pointed the judge's attention to the *Pinkerton* instruction that the court had given to the jury, which said

that a guilty verdict as to the conspiracy count plus a finding that the robbery occurred required a conviction as to the robbery count as well. Nonetheless, the court told the jury that a guilty verdict as to the conspiracy count and no verdict as to the robbery count was a possibility because sometimes "juries will reach verdicts that are apparently inconsistent, and that is permitted." The court then sent the jury off to continue deliberating, and the jury eventually convicted Trout of the conspiracy charge and acquitted him of the robbery count.

On appeal, Trout raises two challenges to the court's treatment of the fourth jury note, both raised for the first time on appeal and thus reviewed for plain error. *United States v. Miller*, 159 F.3d 1106, 1110 (7th Cir. 1998). First, Trout argues that the district court failed to follow the proper procedures for responding to the jury's fourth note. When a jury sends out a note to the district court, "the jury's message should [be] answered in open court and . . . [the defendant's] counsel should have . . . an opportunity to be heard before the trial judge respond[s]." *United States v. Rogers*, 422 U.S. 35, 39 (1975). And because the defendant has a right to be present "at every trial stage," FED. R. CRIM. P. 43(a)(2), he must be present during the discussion of jury notes as well. *United States v. Patterson*, 23 F.3d 1239, 1254 (7th Cir. 1994). Here, before responding to the jury's note, the district court read the note in open court, which included the defendant, and the court told the parties that if the jurors indicated that they were deadlocked, it would discharge them. Trout's attorney had no objection to this approach at the time, nor has he challenged it on appeal. Instead, Trout argues that the district court erred in responding to the jury's follow-up questions when it was already in the court. In his view,

the court should have first discussed the individual juror's question with the parties outside of the jury's earshot before providing an answer.

But Trout has waived this claim because his attorney had already agreed to the substance of the court's response during the discussion of the third jury note. *United States v. Askew*, 403 F.3d 496, 505 (7th Cir. 2005). The jury's third note asked the court whether it could reach different verdicts on the two counts. The court discussed this note with the parties, and Trout's attorney agreed with the court's affirmative answer. The judge then brought the jury in and so instructed them, without Trout's attorney raising any objection. The follow-up discussion following the court's question to the jury covered the same ground as the third note. Accordingly, Trout cannot claim that he should have been consulted before the court gave the same answer.

In addition, Trout argues that the district court erred in the substance of its response to the jury's note. He claims that the judge tendered an instruction that did not comply with this Court's decision in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973). In *Silvern*, this Court provided a model instruction for a district court to give when a jury is deadlocked. In so many words, the instruction gently urges the jury to continue deliberating, reminding each juror to listen to the other jurors and to be open to the opinion of others without surrendering her honest beliefs. *United States v. Rodriguez*, 67 F.3d 1312, 1321 (7th Cir. 1995). If a district court deviates from the approved instruction, this Court will reverse if the ultimate instruction given was "coercive of unanimity." *Id.* at 1320. Trout claims that the district court's statements to the jury were just that; the court should have given the *Silvern*

instruction rather than tell the jury it could reach different verdicts on the two counts.

But before a court is required to give a *Silvern* instruction, the jury must be deadlocked, *Miller*, 159 F.3d at 1110-11, and because the jury was not deadlocked in Trout's case, no *Silvern* instruction was required. After the judge asked the jury whether it was deadlocked and told the jury they could reach different verdicts on the two counts, a juror immediately told the judge that "we'd like to talk about it." The court then discussed the possible verdicts the jury could reach after it was clear that the jury was able to reach a decision or, at a minimum, continue deliberating. In light of the court's inquiry, the jury was simply not deadlocked, and if that's the case, *Silvern* is irrelevant. Accordingly, Trout's argument that the district court erred in not reading the *Silvern* instruction must fail as well.[1]

---

[1] We do not decide whether it was proper for the district court to tell the jury that it could reach legally inconsistent verdicts. Trout has not specifically challenged this instruction on appeal, though he pointed to the district court's statements on the matter as being more "coercive of unanimity" for purposes of his *Silvern* argument. This claim fails both because, as discussed, the jury was not deadlocked and, having agreed to this supplemental instruction following the third note, Trout has waived the claim. This Court's reluctance to allow a defendant to make nullification arguments to the jury would suggest that an instruction permitting inconsistent verdicts would seldom, if ever, be warranted. *See, e.g., United States v. Anderson*, 716 F.2d 446, 449 (7th Cir. 1983). But because the issue is not directly before us, we express no opinion on the matter.

### III. Conclusion

For the foregoing reasons, we AFFIRM both Willis's and Trout's convictions, but VACATE Willis's sentence and REMAND for resentencing.