In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3471

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROHAN G. HERON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06-CR-30068-WDS—**William D. Stiehl**, *Judge.*

ARGUED APRIL 3, 2013—DECIDED JULY 15, 2013

Before POSNER, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Rohan Heron was caught riding shotgun in a tractor-trailer truck filled with over 1,000 pounds of marijuana and 28 kilograms of cocaine, while he was en route from Phoenix, Arizona, to East St. Louis, Illinois. Charged with possession with intent to distribute, Heron denied any involvement with the drugs, claiming that he had agreed to come on the trip as a favor to a friend and that he believed it would

involve the transport of legitimate goods only. This argument failed to persuade the jury; Heron was convicted and sentenced to 120 months' imprisonment.

On appeal, Heron identifies two errors in the trial proceedings that, in his view, warrant reversal. First, he asserts that the government struck a juror based on her religion in violation of *Batson v. Kentucky*. Second, he argues that the district court improperly admitted hearsay evidence that identified him as the "co-driver" of the drug-filled truck. Because we find Heron's *Batson* claim forfeited and conclude that there was no error in the admission of the "co-driver" statement, we affirm Heron's conviction.

# I

## A

At the time the events in this case took place, Heron was working as a commercial truck driver for the CSX Trucking Company and living in Springfield, Massachusetts. Heron's longtime friend, Gigiman Hamilton, was also working as a commercial truck driver. In addition to transporting legitimate loads, Hamilton made money transporting drugs from the West Coast for a trafficker known as "T-Mex." In 2006, during a period in which Heron was temporarily out of work while his truck underwent maintenance and inspection, Hamilton invited Heron to accompany him on one of his cross-country drug-trafficking trips. The plan was for Hamilton and Heron to deliver a legitimate load

of furniture to San Diego, California, stop off in Phoenix to deliver some of Hamilton's daughter's furniture to her new home there, and then pick up a shipment of marijuana that they would deliver on their way back to the East Coast. At trial, Hamilton testified that he informed Heron that their itinerary included transporting marijuana, that Heron agreed to participate, and that they planned to split the anticipated $40,000 fee for delivering the marijuana 50-50. Hamilton explained that having Heron accompany him and share the driving was advantageous, because it allowed him to move more quickly, thereby decreasing the probability that he would get caught.

Hamilton and Heron drove to San Diego and dropped off the load of furniture as planned. They then drove to Phoenix and dropped off the furniture for Hamilton's daughter. On the way to San Diego and Phoenix, Hamilton and Heron took turns sleeping in the truck's sleeper berth. In Phoenix, Hamilton and Heron met with T-Mex to discuss transporting a load of marijuana. Hamilton told T-Mex that he needed to find a legitimate load first, and so he and Heron traveled to Las Vegas, Nevada, where they picked up a load of voting machines. They then returned to Phoenix, where T-Mex and some men identified only as "Mexicans" loaded three boxes of marijuana into the truck's trailer. Heron was present for this, though he did not personally load any of the boxes into the truck. Hamilton testified that Heron began expressing reservations about transporting the marijuana as they drove back to Phoenix from Las Vegas, but that Heron did not attempt

to leave the truck or find some other way of returning to the East Coast.

Once the boxes of marijuana were in the trailer, Hamilton left Heron at a truck stop with the trailer and took the truck's cab to a different location. There, he and the "Mexicans" loaded the cab's sleeper berth with trash bags filled with marijuana and cocaine. As pictures produced at trial confirmed, the sleeper berth was over-flowing with trash bags full of drugs, to the point that Hamilton had to obtain extra straps to keep the ship-ment in place. Hamilton testified that when he returned to the truck stop, Heron commented on the size of the load stuffed into the sleeper berth.

Hamilton and Heron proceeded to drive nonstop from Phoenix to Caseyville, Illinois. Hamilton testified that he and Heron took turns driving. They also took turns sleeping in the passenger seat of the cab, because the sleeper berth was full. Both Lieutenant Detective Mark Rigel, a Missouri police officer assigned to the Drug Enforcement Administration (DEA) and a certified expert in trucking industry standards, and Robert Lombard, Heron's boss at CSX Trucking, noted at trial that this was a violation of federal safety regula-tions and industry standards, which require drivers to spend a large portion of their non-driving time resting in the sleeper berth. See 49 C.F.R. § 395.1(g) (2013). Rigel and Lombard further testified that cargo is not supposed to be stored in the sleeper berth.

Hamilton and Heron reached Caseyville in the early morning hours of May 10. There, they rendezvoused

with T-Mex and Jason Wyatt, a middleman who was brokering the drug sale between T-Mex and a buyer in East St. Louis, in a parking lot behind a Cracker Barrel. After speaking briefly with T-Mex, Hamilton and Heron unhitched the trailer and then set off from the parking lot in the cab, following T-Mex and Wyatt's vehicle.

Unbeknownst to Hamilton or Heron (or to T-Mex or Wyatt), the DEA had been tracking the truck's progress since well before it entered Illinois. The buyer in East St. Louis who was set to receive the marijuana was actually a confidential informant (CI) working with the DEA. The CI informed the DEA that T-Mex and Wyatt, riding in a tractor-trailer stocked with drugs, were headed to Illinois. By the time Hamilton and Heron arrived in Caseyville, DEA surveillance was in place. After observing the meeting between Hamilton, Heron, T-Mex, and Wyatt at the Cracker Barrel, DEA Special Agent Mike Rehg arranged for a local Caseyville police officer, Greg Hosp, to pull the truck over.

Hosp stopped the truck after it made a turn without signaling. Hamilton was driving at that point, and Hosp asked him to step out of the vehicle. Hamilton showed Hosp his driver's license and the truck's bill of lading, which indicated that the truck had left Las Vegas on Monday, May 8. Hamilton stated to Hosp that he left Las Vegas on Monday morning with a load of voting machines and was headed to New York. When Hosp asked where Hamilton was heading when he was pulled over, Hamilton stated that he was going to see a girl. Hamilton hesitated when asked the girl's

name, and did not respond when asked where they were meeting. Hosp then asked if there was anyone accompanying Hamilton, and Hamilton responded that he was with his "co-driver."

Hosp then approached Heron and asked where he was coming from. Heron replied that "they" (he and Hamilton) were coming from Las Vegas, and that they had left Monday morning and driven straight through. Hosp testified that this struck him as odd considering that it meant Hamilton and Heron had been driving for well over 30 hours, which seemed longer than it ought to have taken to drive from Las Vegas to Caseyville. (The journey should, in fact, take approximately 23 hours.) When asked where they were headed when they were pulled over, Heron stated that he and Hamilton were on their way to get food. Again, this struck Hosp as strange, given that the truck was driving away from an area with several food establishments toward an area with no food establishments.

Hosp returned to Hamilton and asked whether he could search the interior of the truck. Hamilton refused, but he did consent to a canine search of the truck's exterior. A K-9 unit was called in, and the dog alerted to the odor of drugs. This led to a full search of the truck's cab and the discovery of 1,100 pounds of marijuana in the trailer and the sleeper berth, as well as 28 kilograms of cocaine in the sleeper berth.

B

Heron wound up charged with one count of possession with intent to distribute 100 kilograms or more of a mixture or substance containing marijuana and one count of possession with intent to distribute five kilograms or more of a mixture or substance containing cocaine, both in violation of 21 U.S.C. § 841(a). Heron originally was convicted by a jury on both counts in June 2007. This court reversed his conviction on appeal, however, after concluding that the district court abused its discretion in denying Heron a requested continuance. *United States v. Heron*, 564 F.3d 879, 883 (7th Cir. 2009).

The government elected to retry Heron on the same charges, and in July 2011, he was again convicted following a jury trial. The district court sentenced him to concurrent prison sentences of 108 months on the marijuana charge and 120 months on the cocaine charge.

On appeal, Heron raises two issues. First, he contends that during jury selection the government used one of its peremptory strikes to remove a juror, Juror #9, on the basis of her religious commitment or "religiosity." Heron asks us to hold that such a religion-based strike violates the Equal Protection Clause. Second, he asserts that the district court abused its discretion in admitting Hosp's testimony that Hamilton identified Heron as his "co-driver" during the traffic stop that led to their arrest. In Heron's view, this statement was improperly admitted under the rule that excludes a co-conspirator's statements from the definition of

hearsay, see FED. R. EVID. 801(d)(2), because it was not made in furtherance of a conspiracy between him and Hamilton. We address each argument in turn.

## II

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the government's discriminatory use of peremptory strikes to exclude African-Americans from a jury violates the Equal Protection Clause, and it established a framework for challenging such strikes. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the Court extended *Batson* to gender-based strikes. Although various observers, including members of the Court itself, have argued that the reasoning in *Batson* and *J.E.B.* ought to apply in any case involving a peremptory strike "based on a classification that is accorded heightened scrutiny under the Equal Protection Clause," *Davis v. Minnesota*, 511 U.S. 1115, 1115 (1994) (mem.) (Thomas, J., dissenting from denial of certiorari), the Court has yet to apply *Batson* outside the confines of race- and gender-based strikes.

Heron asks us to extend *Batson* and *J.E.B.* to peremptory strikes based on "religion," which Heron construes broadly to include strikes based on a juror's level of religious devotion, or "religiosity," as well as strikes based on religious affiliation. This argument faces several obstacles, the first of which is that Heron forfeited it by failing to raise it in the district court. (The government briefly contends that Heron waived any

religion-based *Batson* claim. We disagree. Waiver is "the intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted), and the record here contains no indication that Heron intentionally decided to forgo a religion-related *Batson* challenge.) This is how the *Batson* challenge to the government's peremptory strike of Juror #9 was argued at *voir dire*:

> [Defense Counsel]: With regard to #9, I just want to put on the record that Ms. --- is an African American and there are few in the panel. She is from East St. Louis. In terms of her things that she told us about herself, she has relatives who are in the military service. I would like to object to her removal as a *Batson* challenge.
>
> [Government]: Your Honor, the concerns of Government were on her sheet that was listed where she stated that she had a child that was a social worker, as well as a mother who apparently runs a ministry.
>
> [Court]: A what?
>
> [Government]: A ministry. Concerns of Government with her being sympathetic to the Defendant.
>
> [Defense Counsel]: Well, that that [*sic*] just means they believe in God and they want to help people. But the fact that her daughter's occupation doesn't have anything to do with her mother being involved in ministry. You don't know if she's [a] pastor or just goes to church in some capacity. There is absolutely nothing here with regard to this lady that would justify her removal from this this [*sic*] jury panel.

The exchange then turned to a discussion of how many other African-Americans were on the panel, after which the district court stated that it would overrule the objection and remove Juror #9.

Heron urges us to interpret this exchange, and particularly defense counsel's statement that "[t]here is absolutely nothing here with regard to this lady that would justify her removal," as an objection to the government's attempt to strike Juror #9 on religious grounds—a clumsily phrased objection, perhaps, but one sufficient to place the district court on notice of the substance of the claim. This stretches the transcript too far. As we read the exchange, defense counsel's response to the government's race-neutral (but religion-based) explanation was a pretext argument: in effect, counsel was saying that having a daughter who is a social worker and a mother who is "in ministry" are poor, implausible reasons for a strike, and thus the government's proffered race-neutral explanation is pretextual. Accord *United States v. Willis*, 523 F.3d 762, 766-67 (7th Cir. 2008) (once the party requesting the strike puts forth a facially nondiscriminatory reason for the strike, the district court must determine whether that explanation is deserving of belief or, rather, is pretext for discrimination). Although defense counsel's response *mentioned* religion, nothing else about this exchange indicates to us that he was raising an innovative, distinct *Batson* challenge based on religion, as opposed or in addition to the challenge based on race.

Furthermore, after defense counsel stated that he did not believe that Juror #9's family members' occupations

provided a basis for striking her, the parties and the court continued to discuss the proposed strike in racial terms, turning to the remainder of the panel to see how many African-American jurors were left. Religion did not come up during this subsequent discussion. Finally, had defense counsel actually managed to raise a religion-based *Batson* claim, we would expect either the government or the district court to have acknowledged it. Neither did.

"To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988). Doing so allows the district court to correct its errors in a timely fashion and develops a record that enables meaningful appellate review. See *Willis*, 523 F.3d at 767; *United States v. Davis*, 15 F.3d 1393, 1406-07 (7th Cir. 1994). Defense counsel's recitation of a few words that might, under some circumstances, signal a *Batson* challenge is not enough to preserve the issue for appeal. We therefore find that Heron has forfeited his religion-based *Batson* challenge. Accord *United States v. Brown*, 352 F.3d 654, 662 (2d Cir. 2003) (defendant failed to preserve religion-based *Batson* challenge when objection was not explicitly framed in religious terms); *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (same).

Because the claim was forfeited below, our review is for plain error only. *Stafford*, 136 F.3d at 1114. Under this standard, Heron cannot prevail. Although one of

our sister circuits and a handful of state courts have extended *Batson* to strikes based on a juror's religious affiliation, Heron is asking us to recognize a *Batson* challenge based on a juror's "religiosity," and no court has yet applied *Batson* in that context. See *Brown*, 352 F.3d at 668 (*Batson* prohibits strikes based on affiliation); *State v. Purcell*, 18 P.3d 113, 120-21 (Ariz. Ct. App. 2001) (same); *People v. Martin*, 75 Cal. Rptr. 2d 147, 151 (Cal. Ct. App. 1998) (same); *State v. Hodge*, 726 A.2d 531, 552-53 (Conn. 1999) (same). But see *United States v. DeJesus*, 347 F.3d 500, 510 (3d Cir. 2003) (declining to decide whether a strike based on religious affiliation would violate *Batson*); *State v. Davis*, 504 N.W.2d 767, 772 (Minn. 1993) (declining to apply *Batson* to religious affiliation); *Casarez v. State*, 913 S.W.2d 468, 495 (Tex. Crim. App. 1994) (en banc) (same). (Indeed, the Third Circuit has expressly rejected such a claim. *DeJesus*, 347 F.3d at 510-11.) In the absence of a single authority supporting recognition of Heron's proposed *Batson* claim, we cannot conclude that allowing the government to strike Juror #9 based on her (or her mother's) degree of religious devotion was plain error. Indeed, if the law is unsettled or unexplored, we would want to see more than one lone opinion before we found plain error. See *United States v. Hosseini,* 679 F.3d 544, 551-52 (7th Cir. 2012).

The idea of evaluating the depth of a prospective juror's religious feelings is troubling enough to make us especially reluctant to consider it without a proper exploration in the district court. This is a difficult area, fraught with risks whatever way we turn. Although

one might think there would be value in a rule that categorically endorsed all religion-related strikes so long as they were not overtly based on a juror's religious affiliation, upon closer examination we think that such a rule would come with its own problems. The affiliation/practices distinction may often be illusory, since a person's religious affiliation may be hard to distinguish from religious practices and level of devotion. How would we parse, for instance, whether the peremptory strike of a woman wearing a burqa is based on the fact that she is Muslim or on the fact that she is demonstrably devout? We are not confident that we could coherently distinguish between affiliation and "religiosity" in such a case, and the warning against excessive entanglement into religion found in such cases as *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971), and *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 674-75 (1970), has special force here. Even if the line between affiliation and religiosity were clear, it is unclear why someone's religious affiliation ought to be entitled to greater constitutional protection than that person's religious exercise. These are thorny questions which, given Heron's forfeiture, we are content to save for another day. We also note that Heron in particular faces other serious obstacles: the strike in his case appears to have been based on the religiosity of Juror #9's *mother*; and the religiosity explanation was paired with the "social worker daughter" explanation, which would not have posed a *Batson* problem if raised on its own.

**III**

Heron also challenges the district court's decision to admit Officer Hosp's testimony that Hamilton identified Heron as his "co-driver" during the traffic stop that led to the discovery of the drugs. He contends that the statement was not "in furtherance of a conspiracy" and was therefore not admissible under the co-conspirator exclusion to the hearsay rule. FED. R. EVID. 801(d)(2)(E). We review the district court's ruling for an abuse of discretion; any factual findings made in support of the ruling are reviewed for clear error. *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010).

A statement is admissible under Rule 801(d)(2)(E) if the government proves by a preponderance of the evidence that "(1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). Statements made in furtherance of a conspiracy may include "comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members." *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). A statement may be admissible under Rule 801(d)(2)(E) even if it is not " 'exclusively, or even primarily, made to further the conspiracy.' " *Cruz-Rea*, 626 F.3d at 937 (quoting *United States v. Singleton*, 125 F.3d 1097, 1107 (7th Cir. 1997)).

The district court found that Hamilton's statement to Hosp was made in an effort to prevent Hosp from discovering the illegal drugs in the truck and to hide the criminal objectives of the trip. This strikes us as entirely reasonable, and certainly not clear error. Hamilton's responses to Hosp's questions during the traffic stop could easily be seen as an attempt to portray the trip in a legitimate light and to prevent detection of the vast amount of marijuana and cocaine being transported in the truck. Hamilton's statement that he was accompanied by his "co-driver" was part of that effort. Hosp was certain to notice that there was another person in the truck at some point during the stop (even if he had not when he asked Hamilton whether there was anyone else in the truck), and Hamilton needed to offer some explanation of what Heron was doing there. Moreover, identifying Heron as his co-driver reinforced the legitimate appearance of the trip: having two drivers meant that there was no need to stop for rest, which could explain why Hamilton and Heron were driving in the middle of the night. This was, at a minimum, a reasonable view of the evidence, and the district court did not abuse its discretion in adopting it.

Heron insists that the statement could not have been meant to conceal the conspiracy, because, in his view, it actually tended to *reveal* a conspiracy between him and Hamilton. Not so. The statement revealed only that both Heron and Hamilton were driving the truck, not that the two men were part of a conspiracy to transport narcotics. In context, the statement was part of an effort to convince Hosp that Hamilton and Heron

were legitimate truckers transporting a legitimate cargo; it did not tend to reveal a conspiracy between them.

In any event, even if we were to conclude that the "co-driver" statement was erroneously admitted, we would find that the error was harmless. The sole significance of the statement was that it indicated that Heron had been driving the truck, as opposed to merely accompanying Hamilton as a passenger. While Hosp's statement certainly tended to bolster the government's argument that Heron had been driving, there was additional evidence of Heron's driving. Heron himself stated to Hosp that "they" (meaning he and Hamilton) had driven straight through from Las Vegas. And Hamilton testified at trial that he and Heron had taken turns driving.

It is hard to imagine that any jury would have bought Heron's unwitting-passenger defense, given the evidence presented at trial: Heron was arrested in the cab of a tractor-trailer whose sleeper berth was packed to the gills with marijuana and cocaine. The quantity of drugs made it impossible to crawl into the sleeper berth. Multiple witnesses testified that it was against trucking industry rules to put cargo in the sleeper berth and also that industry rules required that drivers traveling straight through with a co-driver use the sleeper berth for resting. Heron was indisputably an experienced truck driver, and it can be assumed that he was aware of these rules and would have understood the irregularity of traveling with a sleeper berth packed with cargo. Heron also was observed interacting with

T-Mex and Wyatt, the seller and the broker in the drug transaction. The jury had ample basis for concluding that Heron played more than a passive role in transporting the drugs found in the truck and was not an innocent passenger who simply happened to be along for the ride.

Finding no error in the *Batson* and evidentiary rulings, we AFFIRM the judgment of the district court.