In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 20-2167 & 20-2366

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

XAVIER ELIZONDO & DAVID SALGADO,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-286 — **Matthew F. Kennelly**, *Judge.*

_____

ARGUED SEPTEMBER 22, 2021 — DECIDED DECEMBER 21, 2021

_____

Before SYKES, *Chief Judge*, and FLAUM and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Chicago Police Officers Xavier Elizondo and David Salgado used their positions to embezzle drugs and cash, some of which they distributed to informants. As part of their scheme, they encouraged informants to present false information to state judges to obtain search warrants, which in turn yielded more drugs and cash. The FBI caught on and initiated sting operations. The first sting failed

because officers discovered security cameras the FBI had set up at a vacant apartment, leading the defendants to inventory the full amount of money they recovered there. After seeking and obtaining court authorization to wiretap Elizondo's phone, the FBI conducted another sting operation. In the second sting agents recorded Elizondo and Salgado stealing cash they recovered from an FBI-controlled rental vehicle. Salgado saw law enforcement towing the rental vehicle the next day, and he told Elizondo, who in turn instructed Salgado to "relocate" items from Salgado's home.

A grand jury indicted Elizondo and Salgado on conspiracy and theft charges related to their scheme. Elizondo was also charged with obstruction of justice for instructing Salgado to destroy or conceal evidence. They went to trial and a jury found them guilty on all counts. Elizondo and Salgado appeal: (1) the use of the evidence obtained from the government's wiretap application; (2) the district court's *Batson* inquiry during jury selection; (3) the sufficiency of evidence on the obstruction charge; and (4) the district court's calculation of the intended loss under the Sentencing Guidelines.

We find no reversible error. The wiretap application was not an improper subterfuge search because the government was forthright about the scope of its investigation. Likewise, we can trace the logic of the district court's *Batson* inquiry, and that court followed the applicable steps. The evidence presented at trial on the obstruction charge was sufficient for the jury to infer that Elizondo acted with the intent to prevent the use of evidence in an official proceeding. Finally, there was no clear error in the district court's loss calculation at

sentencing. We therefore affirm Elizondo and Salgado's convictions and sentences.

## I.

### A. Factual Background

*The criminal scheme*. Elizondo and Salgado were Chicago Police Department ("CPD") officers assigned to the 10th district team that worked gang and narcotics investigations for an area of the city's west side. Elizondo was the team's sergeant, which afforded him supervisory responsibilities. Officers embedded with gang teams proactively investigate crimes and develop relationships with confidential informants, wearing civilian clothes to blend in with their surroundings. They also investigate, prepare, and obtain search warrants based on the informants' anonymous tips.

Between mid-2017 and January 2018, Elizondo and Salgado used their positions as gang-team officers to steal cash and drugs from search locations. They distributed portions of the proceeds to informants. The two officers also encouraged informants to supply false information to state judges to obtain search warrants, which they then executed, stealing portions of the proceeds from those searches.

*The investigation's origins.* In late 2017, after receiving information about alleged corrupt activity, the FBI began investigating Elizondo and Salgado's CPD unit. Jeffrey Owens, who went by the nickname "Cuba," had been working with the FBI as a confidential source on other investigations. Cuba served as the FBI's confidential informant in this investigation. Antwan Davis—an acquaintance of Cuba's who FBI agents believed had a relationship with corrupt CPD officers—introduced Cuba to

Elizondo and Salgado. The FBI recorded conversations between Cuba and Davis, in which Cuba sought to obtain information about the officers.

*The Maplewood apartment ruse.* At the FBI's direction, Cuba told Elizondo and Salgado about a "drug stash house" where he claimed large quantities of illegal narcotics were kept. But the FBI had set up a sting operation. No drugs were placed at the "stash house,"—an apartment located on Maplewood Avenue. Instead, in December 2017, FBI agents placed $15,000 in cash at the apartment and equipped it with surveillance cameras. Elizondo spoke to Cuba, offering to search the apartment and give Cuba and Davis a portion of the items recovered. Elizondo and Salgado obtained a search warrant by arranging for Davis to provide false information to a state judge.

On December 20, 2017, Elizondo, Salgado, and several other officers raided the Maplewood apartment. Salgado recovered the $15,000 in cash that the FBI had planted. The CPD officers executing the search also discovered the hidden surveillance cameras and disconnected them. So the officers inventoried the $15,000 and did not steal any of it. On December 28, 2017, Elizondo told Cuba that he and his team had inventoried the full amount of cash recovered from the apartment because the cameras had recorded the officers' search. Per Elizondo, "if they didn't find the cameras, it would have been a good Christmas for everybody."

*The initial Title III application and order.* Next, on January 24, 2018, the government sought court authorization to intercept wire and electronic communications over Elizondo's phone under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. The government made its application to the Chief

Judge of the United States District Court for the Northern District of Illinois, who has responsibility for such matters in that district. To support its request for a wiretap, the government included the affidavit of FBI Special Agent Marc Recca. In his affidavit, Agent Recca stated that the requested wiretap concerned offenses involving the distribution of narcotics (21 U.S.C. § 841), conspiracy to distribute narcotics (21 U.S.C. § 846), and wire fraud (18 U.S.C. § 1343). Each of those statutes is a predicate under Title III. *See* 18 U.S.C. § 2516(1)(c), (e).

The affidavit described the scope of the government's investigation to the Chief Judge:

> [t]he FBI is investigating allegations that CPD officers … including ELIZONDO and SALGADO, are engaged in a corrupt scheme to: (1) steal and embezzle evidence—namely, narcotics and money—recovered during searches conducted pursuant to their duties as sworn law enforcement officers; and (2) provide false information to judges in support of search warrants as a means to fraudulently obtain property.

The Chief Judge granted the government's application for a Title III order on January 24, 2018. The government intercepted Elizondo's phone conversations between January 24, 2018, and January 31, 2018.

*The rental-vehicle ruse.* At the FBI's direction, Cuba told Elizondo on January 28, 2018—four days into the wiretap of Elizondo's phone—that a drug dealer was storing drugs and cash in a vehicle near Midway Airport on Chicago's

southwest side. The vehicle was in fact an FBI-controlled rental car in which agents had placed $18,200 in cash. That night, Elizondo and Salgado, along with two other officers, arrived at the vehicle's location and searched the car. Elizondo discovered the cash, which was hidden in the right compartment of the trunk. He showed the cash only to Salgado, not the other officers, and he conferred with Salgado privately. Next, Elizondo directed the other officers to move the rental vehicle to a nearby warehouse parking lot to continue the search, not a usual CPD practice. There, Salgado took the cash from the trunk, and Elizondo placed it in his CPD vehicle. Later that evening, Elizondo called Salgado and told him, "[w]e're good." The officers inventoried only $14,000 of the $18,200 seized from the rental vehicle.

*The obstruction of justice.* On January 29, 2018, CPD Internal Affairs Lieutenant Timothy Moore—who was detailed as an FBI task force officer—and FBI Special Agent Robert Leary went to CPD's Homan Square facility to recover the inventoried $14,000 and the rental vehicle used in the previous night's operation. Moore and Leary called a tow truck for the car, and Salgado approached them in the parking lot. Moore identified himself as being from the CPD's Internal Affairs Division, and he stated he would be in contact with Salgado.

Now worried, Salgado called Elizondo and told him CPD Internal Affairs had towed the vehicle. Elizondo asked, "you know what to do, right?" Salgado responded, "Yeah." Elizondo said, "Just relocate everything, alright?" Salgado responded, "Huh?" Elizondo replied, "Just relocate everything[,] you know?" Salgado responded in the affirmative. Less than ten minutes later, Salgado called back

and Elizondo told him to "just make sure, whatever you have in your house isn't there no more, you know what I mean?" Salgado responded, "Yeah, yeah." He asked Elizondo where to put the items that were in his house, to which Elizondo responded, "I don't know[.]"

Salgado then traveled from Homan Square to his home, where he stayed briefly. Elizondo and Salgado both deleted call records from their cellphones over the next twelve hours, including records of the calls in which Elizondo instructed Salgado to remove items from his home.

*Elizondo's subsequent conversations.* After speaking with Salgado, Elizondo had several conversations with other individuals that revealed he believed he was under criminal investigation. In one conversation, Elizondo spoke to Davis and asked about Cuba's identity and legal name because "it seems a little odd he says there's gonna be drugs and money there when we go there and it's just money, you know?" Around the same time—about 20 minutes after the last recorded call in which he instructed Salgado to remove or conceal evidence—Elizondo spoke to CPD officer Mike Karczewski, telling him that the incident with the rental vehicle involved the FBI.

A few minutes later, Salgado called Elizondo and told him Moore was with the Confidential Matters unit of CPD Internal Affairs, which investigates criminal activity by police officers. Elizondo speculated that he and Salgado were the targets of an investigation "because we do so many search warrants[.]" Later that night, Elizondo also spoke by phone with CPD officer Jose Lopez. Elizondo told Lopez that law enforcement had "planted" money "in the car last night." Further, Elizondo stated that Cuba was obviously "working with the

feds." Lopez confirmed he shared Elizondo's suspicion, noting "with money that big it's gonna be the–it's gonna be the feds." Elizondo speculated the investigation was specifically by the "FBI, group public corruption, I'm assuming."

*The post-interception Title III application and order.* The next day, on January 30, 2018, the government requested judicial authorization to use intercepted communications to prosecute offenses including embezzlement, theft, conspiracy, and obstruction of justice, asserting that the communications were intercepted "incidentally and in good faith during the course of the interceptions conducted pursuant to the Interception Order" under 18 U.S.C. § 2517(5). The Chief Judge agreed and granted the government's post-interception application that same day.

## B.  Procedural History

The grand jury returned an indictment charging Elizondo and Salgado with conspiracy to embezzle, steal, and misapply property in CPD custody, in violation of 18 U.S.C. § 371, and theft of federal funds, in violation of 18 U.S.C. § 641. Salgado was also charged with making a materially false statement to a federal agent. Both defendants pleaded not guilty.

Elizondo moved to suppress the communications the FBI had intercepted by wiretap, arguing the government had engaged in a subterfuge search by seeking a Title III order to intercept communications related to narcotics and wire-fraud offenses but instead investigating offenses that were not predicates under Title III. The government opposed, and in its written opinion and order the district court denied the motion. The court concluded that the government's citation to

the narcotics and wire-fraud statutes was not a subterfuge because at the time of the wiretap application there was probable cause to believe Elizondo would violate each set of statutes.

Elizondo and Salgado were then charged in a seven-count superseding indictment. Counts One, Two, and Three charged both defendants with conspiracy to embezzle, steal, and misapply property; conspiracy against Fourth Amendment rights; and theft of federal funds, respectively. Count Four charged Elizondo with attempting to corruptly persuade Salgado to destroy or conceal an object for use in an official proceeding—the federal grand jury investigation—in violation of 18 U.S.C. § 1512. Count Five charged Salgado with making a materially false statement to a federal agent by telling an FBI agent that he did not remember whether he returned home on January 29, 2018. Finally, Counts Six and Seven charged both Elizondo and Salgado, respectively, with altering or destroying a record with intent to impede, obstruct, and influence the investigation and administration of a matter within the FBI's jurisdiction. Both defendants proceeded to trial together.

At jury selection, the district judge raised, sua sponte, a *Batson* challenge, stating that one of Elizondo's attorneys engaged in a pattern of striking black prospective jurors. The judge noted there were twelve black prospective jurors among the 58 members of the venire panel. Of the twelve, four were excused for cause or hardship, leaving eight black members of the venire panel—three of which were far enough down the list that it was highly unlikely any of them would be seated on the jury. That left five black prospective jurors with a greater likelihood of being seated. Defense counsel had

used peremptory strikes to exclude each of them. After hearing the attorneys' positions on the matter, the district judge sustained the *Batson* challenge and overruled the peremptory strike of Juror No. 14, who was black and seated on the jury.

During trial, the government presented evidence of the defendants' scheme, including the testimony of informants who worked with Elizondo and Salgado. The government played Title III intercepts and excerpts of conversations between Cuba and Elizondo and Davis, which Cuba had consensually recorded (that is, with one party's consent) at the FBI's direction. In those recordings, Davis discussed the defendants' scheme, and Elizondo explained the decision to inventory the full $15,000 seized from the Maplewood apartment. Two FBI agents testified they had worked with Elizondo while he was detailed to the FBI, where grand juries were empaneled at the beginning of an investigation and before a confidential source was deployed. At the close of the nine-day trial, the jury convicted Elizondo and Salgado on all counts.

At Elizondo and Salgado's sentencing hearings, the government objected to the probation department's loss calculation, comprised of the $4,200 the defendants misappropriated during the rental-vehicle ruse, plus the value of cash and other items taken on other occasions. The government contended the aggregate intended loss exceeded $6,500. The district court sustained the government's objections and found by a preponderance of the evidence that the government had shown the intended loss was between $6,500 and $15,000. Elizondo was sentenced to 87 months'

imprisonment, and Salgado was sentenced to 71 months' imprisonment. Both defendants timely appealed.

## II.

Section (A) below covers the government's application for a Title III order and Elizondo's motion to suppress the recordings obtained as a result of that order. In Section (B), we evaluate defendants' challenges to the district court's jury-selection procedures, including its *Batson* inquiry. Section (C) addresses Elizondo's appeal from the denial of his motion for a judgment of acquittal on the obstruction charge. Finally, Section (D) analyzes the defendants' objections to the district court's calculation of the intended loss under the Sentencing Guidelines.

### A. Title III Application and the Motion to Suppress

We begin with Elizondo and Salgado's challenge to the legality of the government's application for a wiretap and the denial of Elizondo's motion to the suppress the evidence so obtained. "[W]e review the district court's factual findings for clear error and its conclusions of law de novo." *United States v. Santiago*, 905 F.3d 1013, 1018 (7th Cir. 2018) (citation omitted).

Title III enumerates a list of offenses that allow the government to apply for an order to intercept communications "when such interception may provide or has provided evidence of" the specified crimes. 18 U.S.C. § 2516(1). Narcotics-distribution and wire-fraud offenses are predicate crimes under Title III, but the crimes with which Elizondo and Salgado were charged—including conspiracy to embezzle and steal property, conspiracy to violate

constitutional rights, and theft of federal funds—are not. *See* 18 U.S.C. § 2516(1)(c), (e).

A judge may enter an ex parte order for the interception of communications if (a) there is probable cause to believe the target is committing or will commit an enumerated offense; (b) there is probable cause to believe "particular communications concerning that offense will be obtained through such interception"; and (c) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(a)-(c).

Under 18 U.S.C. § 2517(5), communications related to non-enumerated offenses may be used so long as the government makes a timely post-interception application to a judge and the communications are "otherwise intercepted in accordance with" Title III's provisions. In *United States v. Arnold*, this court stated that "[t]he post-interception application requirement of § 2517(5)" prevents "subterfuge searches." 773 F.2d 823, 829 (7th Cir. 1985); *see also In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384, 388 (2d Cir. 1989) (same). That is, 18 U.S.C. § 2517(5) prevents the government applicant for a Title III order from "nam[ing] one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied." *Arnold*, 773 F.2d at 829 (quoting *United States v. Marion*, 535 F.2d 697, 700–01 (2d Cir. 1976)); *accord United States v. Campagnuolo*, 556 F.2d 1209, 1213 (5th Cir. 1977) (same).

By its terms, Title III contains no requirement that the interception of communications related to non-enumerated offenses must be inadvertent—taking the government by surprise—rather than merely incidental. *See United States v.*

*Goffer*, 721 F.3d 113, 122–23 (2d Cir. 2013); *United States v. Rajaratnam*, No. 09-CR-1184-RJH, 2010 WL 4867402, at *5 (S.D.N.Y. Nov. 24, 2010), *aff'd*, 719 F.3d 139 (2d Cir. 2013). Title III's failure to require inadvertent interception as a prerequisite to the later use of communications relating to non-enumerated offenses is significant, as "absent provision[s] cannot be supplied by the courts." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012); *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019). Rather, given the lack of statutory language to the contrary, the government may use communications intercepted incidentally upon a proper post-interception application. And "[e]vidence of crimes other than those authorized in a wiretap warrant are intercepted 'incidentally' when they are the by-product of a bona fide investigation of crimes specified in a valid warrant." *United States v. McKinnon*, 721 F.2d 19, 23 (1st Cir. 1983).

Here, we agree with the district court that the government did not engage in a subterfuge search because it was forthright in its application for a wiretap. The government described the scope of its investigation when it applied for a Title III order, and it did not conceal anything material. Thus, the wiretap was not a subterfuge search, and the communications at issue were "otherwise intercepted in accordance with" Title III. 18 U.S.C. § 2517(5).

In applying for the Title III order to intercept Elizondo's communications, the government detailed its investigation as follows:

> [t]he FBI is investigating allegations that CPD officers … including ELIZONDO and SALGADO, are engaged in a corrupt scheme to:

> (1) steal and embezzle evidence—namely, narcotics and money—recovered during searches conducted pursuant to their duties as sworn law enforcement officers; and (2) provide false information to judges in support of search warrants as a means to fraudulently obtain property.

Although the government explained it anticipated intercepting communications that would constitute evidence of drug trafficking and wire fraud, it did not limit its investigation to those offenses. Rather, the government described the contours of the criminal scheme it was probing and applied for a wiretap to uncover additional evidence of that scheme. The Chief Judge was not misled into granting the application for a wiretap order.

Several of the crimes with which the defendants were charged—conspiracy to embezzle and steal property, conspiracy to violate Fourth Amendment rights, and theft of federal funds—are offenses for which it is foreseeable that the investigation the government described in its initial wiretap application would yield evidence. Title III does not prohibit the use of incidentally-obtained wiretap evidence to prosecute those offenses, as a suspect is not "insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio." *McKinnon*, 721 F.2d at 23.

The wiretap ultimately revealed evidence related to crimes Elizondo and Salgado committed in connection with the cover-up of the underlying embezzlement offenses.

Likewise, the interception of such evidence was incidental and not a subterfuge because Elizondo and Salgado have not shown that collecting evidence related to the cover-up offenses was the government's true objective in applying for a wiretap. *See McKinnon*, 721 F.2d at 22–23; *Arnold*, 773 F.2d at 829. Instead, the record establishes that the government sought to use the wiretap to uncover evidence that the defendants were engaged in the illegal distribution of narcotics.

Although Elizondo and Salgado contend otherwise, there was probable cause to believe the wiretap would intercept communications proving that they were violating Title III-predicate narcotics offenses. In conversations that the FBI consensually recorded before it obtained the initial Title III order—and that were recounted in the government's initial application—Elizondo described giving informants a cut of the drugs and cash that he and other CPD officers obtained during searches for which those informants provided tips. According to Agent Recca's affidavit, Elizondo explained he had to inventory the $15,000 in cash recovered during the December 20, 2017 search because the security cameras had recorded the officers.

We conclude the government has shown that the rental-vehicle ruse was designed in part to elicit further and more conclusive evidence of drug-trafficking activity than the evidence the government had at its disposal when it applied for the initial Title III order. At the FBI's direction, Cuba told Elizondo that the rental vehicle contained narcotics, and Elizondo later confirmed that was his understanding in a recorded call. It was foreseeable that the ruse could have led Elizondo to make unambiguous statements about his plan to

distribute drugs. That the wiretap did not record Elizondo making such statements has little bearing on our inquiry in this context.

Elizondo and Salgado argue the government could have designed other sting operations to elicit stronger evidence of their drug-trafficking activity, but we are not persuaded. The the government could have used alternative investigative techniques, but that is not sufficient to show the Title III application was an improper subterfuge search. Moreover, Agent Recca's affidavit explained that the use of sham narcotics would create a significant risk to the government's objectives: if Elizondo or others were to field test those narcotics, they would likely deduce a sting operation was in progress and therefore take further steps to avoid detection.

We find no error in the government's application for a Title III wiretap order or the district court's application of the law to the facts Elizondo adduced. So, we affirm the denial of his motion to suppress the fruits of that wiretap.

### B. Jury Selection and the *Batson* Inquiry

We turn next to defendants' assertions that the district court erred during jury selection. They advance two related contentions: first, that the district court improperly shifted the burden applicable to *Batson* challenges, and second, that the jury-selection proceedings were unreasonably rushed. We examine the *Batson* issue first.

Before addressing the district court's *Batson* inquiry, we recognize the parties' dispute over the applicable standard of review on this question. The defendants ask for de novo review of the district court's *Batson* procedure, and the government argues for plain error review because the

defendants did not object to that procedure. Although the defendants argue they were not required to formally object under Federal Rule of Criminal Procedure 51, their contentions before that court went to the merits of the *Batson* analysis rather than to how it proceeded. That would counsel reviewing the district court's *Batson* inquiry for plain error. *See United States v. Heron*, 721 F.3d 896, 901–02 (7th Cir. 2013) (where a defendant fails to alert the trial court of the specific grounds for an objection under *Batson*, our review is only for plain error); *accord United States v. Gooch*, 665 F.3d 1318, 1330–32 (D.C. Cir. 2012) (discussing the application of plain error review where *Batson* objections are not properly raised with the district court).

Even if we were to conclude otherwise, though, we would still review the district court's *Batson* findings for clear error and owe great deference to its credibility determinations. *See United States v. Lovies*, 16 F.4th 493, 500 (7th Cir. 2021) (citing *United States v. Cruse*, 805 F.3d 795, 806 (7th Cir. 2015); *United States v. Rutledge*, 648 F.3d 555, 558 (7th Cir. 2011)). "Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court to make credibility determinations." *Rutledge*, 648 F.3d at 558 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)). Accordingly, we will affirm unless we "arrive at a definite and firm conviction that a mistake has been made." *Cruse*, 805 F.3d at 806.

A *Batson* challenge requires the opponent of a peremptory strike to show that the strike's proponent acted with a racially discriminatory intent. *Lovies*, 16 F.4th at 499 (citing *Cruse*, 805 F.3d at 806). A challenge proceeds in three steps. At the first step, the challenger must make a prima facie case that the

peremptory strike was racially motivated. *Cruse*, 805 F.3d at 806 (citing *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008)). This low burden requires "only circumstances raising a suspicion that discrimination occurred." *Id.* at 807 (quoting *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005) ("*Stephens I*")). If the challenger meets his burden at step one, the second step requires the strike's proponent to articulate a non-discriminatory reason for the strike. *United States v. Stephens*, 514 F.3d 703, 710 (7th Cir. 2008) ("*Stephens II*"). The district court does not consider the persuasiveness of the justification for the peremptory strike at step two. *Id.* (*citing Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)); *see also Lovies*, 16 F.4th at 500.

At the third and final step, the trial court determines "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Cruse*, 805 F.3d at 807 (quoting *Johnson v. California*, 545 U.S. 162, 171 (2005)). Because the relevant question at step three is whether a strike was racially motivated, a trial judge must "assess the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Id.* at 808 (quoting *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006)) (emphasis in original). "The trial court may consider all relevant circumstances when assessing the honesty of a proffered explanation for a peremptory strike, including interpreting the demeanor of the attorney who initiates the strike and evaluating the explanation's plausibility with reference to its basis in accepted trial strategy." *Lovies*, 16 F.4th at 500 (internal quotation marks and citations omitted).

The district court's application of *Batson* here met the requirements of that case and its successors. Although the trial judge's decision to sua sponte raise the *Batson* challenge

was unorthodox—a point to which we return later—defendants have not directed us to a cognizable legal error in the district court's application of the *Batson* framework. The district court followed each of the applicable steps and determined, at the third and final step, that the reason Elizondo's attorney offered for striking Juror No. 14 was a pretext for racial discrimination. Given the deference we owe to the trial judge's determinations, we cannot conclude that a mistake has been made, so we affirm the trial court's decision to sustain its own *Batson* challenge. Further, any error in sustaining the challenge was harmless because Elizondo and Salgado do not contest Juror No. 14's impartiality.

During voir dire, the trial judge observed that five of Elizondo's seven peremptory strikes were to black members of the venire panel. Of the five black prospective jurors remaining under consideration, Elizondo exercised his peremptory challenges against each one. This was enough to meet the low burden at *Batson* step one. *See Stephens I*, 421 F.3d at 512; *United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009). It constituted a "pattern of strikes" that gave rise to "an inference of intentional discrimination." *Anderson v. Cowan*, 227 F.3d 893, 901–02 (7th Cir. 2000); *see also Batson v. Kentucky*, 476 U.S. 79, 96–97 (1986).

We understand the defendants to argue the district court sustained the *Batson* challenge at step two, impermissibly shifting the burden to defense counsel and finding that they failed to offer a race-neutral reason for striking the potential jurors. But their assertion is not supported by the record.

The reason that defense counsel gave for striking Juror No. 14 was that juror had prior negative experiences with law-enforcement officers. Under case law, that was a sufficient

race-neutral reason to meet the requirements of step two. *See Stephens II*, 514 F.3d at 710–11 (a reason need only be race neutral, not necessarily persuasive in any way, to pass step two). Although we encourage district courts to carefully delineate between each *Batson* step, *Lovies*, 16 F.4th at 503–04, there is no rigid requirement that a trial judge declare on the record that step two has been satisfied before proceeding to step three. Nor do Elizondo and Salgado cite any authority to support such a proposition.

On the third and final step, the district court's procedure also was adequate. The court asked defense counsel to differentiate Juror No. 14 from two of the non-stricken white members of the venire panel who discussed similar negative experiences with law enforcement. As the government urges, defense counsel was so prompted because the race-neutral explanation for striking Juror No. 14 was initially found not to be credible. But the defense was then offered another opportunity to bolster its explanation for the strike. At this point, the trial judge was tasked with deciding whether the burden of proving purposeful discrimination had been carried, considering the persuasiveness of the justification that counsel provided, whether that justification had any basis in accepted trial strategy, and the attorney's demeanor. *See Cruse*, 805 F.3d at 807; *Lovies*, 16 F.4th at 500.

The judge determined that the differences between Juror No. 14 and the non-stricken white jurors were pretextual. He explained, "I don't think you've justified the difference between [Juror No. 14] and other similarly situated people. I think the challenge has been exercised because of the person's race." In applying step three of the *Batson* inquiry, the district

court evaluated the justification for the strike, finding it lacking and pretextual.

The trial court's application of the *Batson* framework was not erroneous. A trial court may infer discriminatory intent where it determines the proffered justification for a peremptory strike is pretextual. *Cruse*, 805 F.3d at 807 (citing *Snyder*, 552 U.S. at 485). "If [the strike proponent's] proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011) ("*Taylor III*") (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)). As arbiter of the *Batson* challenge, the trial judge concluded the reason offered for striking Juror No. 14—that juror's negative experience with police officers—applied just as well to otherwise-similar white panelists who were permitted to serve on the jury. After finding pretext, the judge concluded that the burden of proving purposeful discrimination had been carried and sustained the challenge. That was a proper application of *Batson*'s framework.

A district court's finding of pretext is reviewed for clear error, and we cannot reach a definite and firm conviction that a mistake has been made on this factual record. *See Cruse*, 805 F.3d at 806; *United States v. Hunter*, 932 F.3d 610, 617 (7th Cir. 2019). So, we affirm the district court's decision to sustain the *Batson* challenge.

Elizondo and Salgado also argue the district court erred by rushing jury selection. They contend that the flaws in the district court's *Batson* procedures and the hurried voir dire

process, individually and combined, created structural error that entitles them to a new trial.

We disagree on both counts and conclude that any error was harmless. First, we see no basis for the assertion that jury selection was unreasonably rushed. The process lasted an entire day, and the district court thoroughly questioned jurors to ensure they were fair, impartial, and qualified to serve. A trial court does not err when it requires attorneys to make peremptory strikes and explain them in a timely fashion.

Next, the defendants' allegation of structural error in the district court's *Batson* analysis is foreclosed by *Rivera v. Illinois*, 556 U.S. 148 (2009). Rejecting a contention similar to the one here, the Supreme Court reasoned that the only right at stake is the defendant's right to a fair trial before an impartial jury. *See id.* at 157–58. The mistaken denial of a peremptory challenge does not itself violate a defendant's constitutional rights. *See id.* at 158, 160.

This court and other circuits have held that under *Rivera*, harmless-error analysis applies to claims of an allegedly erroneous denial of a peremptory challenge. *Jimenez v. City of Chicago*, 732 F.3d 710, 714–16 (7th Cir. 2013); *accord United States v. Bowles*, 751 F.3d 35, 38–39 (1st Cir. 2014); *United States v. Williams*, 731 F.3d 1222, 1236–37 (11th Cir. 2013). The error is harmless if the party whose peremptory strike was overruled cannot show that the juror seated as a result of that ruling was biased. *See Jimenez*, 732 F.3d at 714–16.

Elizondo and Salgado do not argue Juror No. 14 was biased against them. Because they do not challenge the impartiality of this or any other juror, any error was harmless. The defendants point to the Sixth Circuit's decisions in *United*

*States v. McFerron*, 163 F.3d 952 (6th Cir. 1998), and *United States v. Kimbrel*, 532 F.3d 461 (6th Cir. 2008), which held that the erroneous denials of peremptory challenges in those cases were structural errors. But these out-of-circuit cases predate *Rivera* and do not bind us. The facts in *McFerron* and *Kimbrel* also diverge from the facts here in an important way. In those cases, the district courts incorrectly stated that the defendants—the proponents of peremptory strikes—had the burden of persuasion at *Batson* step three. *See McFerron*, 163 F.3d at 953–54; *Kimbrel*, 532 F.3d at 467. In contrast, the district judge here did not state that the defense had the burden of persuasion at *Batson* step three. So *McFerron* and *Kimbrel* are not applicable.

Nor is this case like *United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001), on which the defendants ask us to rely. In *Harbin*, the government—but not the defendant—was permitted to exercise a peremptory challenge on the sixth day of an eight-day trial. *Id.* at 547. This court reversed the district court and vacated the defendants' convictions, concluding that structural error required reversal because the district court's procedure "gave the prosecutor unilateral, discretionary control over the composition of the jury mid-trial." *Id.* Here, though, the parties had equal opportunities to exercise their peremptory strikes, which occurred before trial, so *Harbin* does not suggest structural error in this case.

We take this opportunity to emphasize that district courts should take great care before raising a *Batson* challenge sua sponte. In *Doe v. Burnham*, 6 F.3d 476 (7th Cir. 1993), we stated that "a court should at least wait for an objection before intervening in the process of jury selection to set aside a peremptory challenge." *Id.* at 481. Similarly, this court has

observed that the jury-selection process "is still an adversarial one and the case law, including *Batson* and the cases that followed it, make it clear that *Batson* issues must be raised. *Batson* is not self-executing." *Aki-Khuam v. Davis*, 339 F.3d 521, 527 (7th Cir. 2003) (internal quotation marks and citation omitted).

Elizondo and Salgado concede that district courts have authority to raise a *Batson* challenge sua sponte. We agree. The Supreme Court has held that when a trial court excuses jurors from service because of their race, state action is present "[r]egardless of who precipitated the jurors' removal." *Georgia v. McCollum*, 505 U.S. 42, 53 (1992). This is so because "[b]y enforcing a discriminatory peremptory challenge, the court has not only made itself a party to the [biased act], but has elected to place its power, property and prestige behind the [alleged] discrimination." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991) (internal quotation marks and citations omitted). Because racially discriminatory peremptory strikes constitute state action regardless of who initiates them—and because we have not located contrary authority—we conclude that federal trial judges have the authority to raise *Batson* challenges to protect "the integrity of the judicial system." *Id.* at 628.

Nevertheless, we reiterate that the best practice is for a district court to wait for an objection under *Batson* rather than to raise an objection on its own. "Judges should invade a party's discretion to strike potential jurors only in narrow circumstances." *Doe*, 6 F.3d at 481; *accord Bowles*, 751 F.3d at 38 n.1 ("[A] trial judge should rarely engage sua sponte in a *Batson* enquiry absent surrounding circumstances, identified by the court on the record, that are strongly suggestive of

discrimination."). When a district judge infers that the jury-selection process may indicate racial or gender-based[1] discrimination, the judge may initiate a bench conference and invite one of the attorneys to raise a challenge under *Batson* if the attorney wishes to do so.

If a district judge decides to raise *Batson* sua sponte, the judge must take care to ensure that the burden is not shifted to a peremptory strike's proponent. The trial judge must meticulously separate the role of *Batson* challenger from the role of neutral arbiter of the challenge. In particular, a judge should be careful not to automatically accept his or her own rationale at *Batson* step one. A heightened risk of a judge reflexively finding a prima facie case of discrimination at step one is present where the judge articulates the reasoning behind the challenge and then must also evaluate that same rationale. The proponent of a peremptory strike remains entitled to a neutral assessment of the proffered prima facie case of discrimination and the possibility that that case may be rejected if it is insufficient. *See Bennett v. Gaetz*, 592 F.3d 786, 791 (7th Cir. 2010); *Johnson v. California*, 545 U.S. at 170 (observing that the first step under *Batson* requires the challenger to present "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

### C. Obstruction Charge and Sufficiency of the Evidence

Next, we turn to Elizondo's challenge to the sufficiency of the evidence on Count Four, the obstruction charge. He moved for acquittal as a matter of law under Federal Rule of

---

[1] In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the Supreme Court extended the *Batson* framework to gender-based discrimination.

Criminal Procedure 29(c), arguing there was insufficient evidence from which to infer that he foresaw a particular official proceeding when he instructed Salgado to destroy or conceal evidence. Rejecting his argument, the district court denied Elizondo's motion, which he renews on appeal.

We review the denial of a Rule 29 motion de novo and ask whether, after viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (quoting *Jackson*, 443 U.S. at 319). "[D]eference to the jury's deliberations prevents us from assessing the quality of the evidence." *United States v. Godinez*, 7 F.4th 628, 638 (7th Cir. 2021). "We respect the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *Id.* at 638–39 (citation omitted). Accordingly, when reviewing a defendant's appeal of the denial of his Rule 29 motion, we "draw all reasonable inferences in the light most favorable to the prosecution." *United States v. Niggemann*, 881 F.3d 976, 980 (7th Cir. 2018); *see also United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017).

A defendant challenging a jury verdict under Rule 29 "faces a nearly insurmountable hurdle" because the court views the evidence in the light most favorable to the government and defers to the jury's credibility determinations. *Torres-Chavez*, 744 F.3d at 993 (citing *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999)). We will "overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the

[factfinder] could find guilt beyond a reasonable doubt." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (internal quotation marks and citations omitted).

Under the federal obstruction statute, anyone who "corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so" obstructs justice. 18 U.S.C. § 1512(c). To be convicted of obstruction under § 1512(c)(1), a defendant "must believe that his acts will be likely to affect a pending or foreseeable proceeding." *United States v. Matthews*, 505 F.3d 698, 708 (7th Cir. 2007) (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707 (2005)); *accord United States v. Kaplan*, 490 F.3d 110, 125 (2d Cir. 2007) (same).

Count Four charged Elizondo under 18 U.S.C. § 1512(b)(2)(B) with "corruptly persuad[ing]" Salgado with intent to "cause or induce" him to "alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(b). The same standard for foreseeability that governs corruption charges under 18 U.S.C. § 1512(c)(1)—a defendant must believe his acts will be likely to affect a pending or foreseeable proceeding—applies to Elizondo's charge pursuant to 18 U.S.C. § 1512(b)(2)(B). *See Matthews*, 505 F.3d at 708. No party contends that a different standard applies.

Audio recordings and trial testimony provided ample evidence to support the jury's verdict on the obstruction charge. Elizondo and Salgado's conversation immediately after the rental vehicle was towed strongly suggests an intent

to destroy or conceal evidence. Salgado told Elizondo that the CPD's Internal Affairs Division had towed the car. Without missing a beat, Elizondo instructed Salgado to "[j]ust relocate everything." This evidence shows Elizondo knew an investigation into his practices was ongoing, and he attempted to obstruct that investigation.

The question Elizondo raises on appeal is whether—at the point he instructed Salgado—he knew or foresaw that a federal grand-jury proceeding was ongoing. Notably, two FBI special agents testified at trial that they worked with Elizondo at the FBI, during which time grand juries were empaneled at the beginning of an investigation. So, the jury heard testimony that Elizondo would have known, based on his prior experience, that the FBI's deployment of a confidential source indicated a grand-jury proceeding had been opened.

Evidence the government presented at trial provides the necessary link between testimony about Elizondo's knowledge of FBI procedures and his intent when instructing Salgado to destroy or conceal evidence. Officer Karczewski testified that Elizondo told him the FBI was involved in the rental-vehicle incident. This conversation occurred only about 20 minutes after Elizondo gave his last recorded instruction for Salgado to destroy evidence. Later that night, Elizondo also told Officer Jose Lopez that Cuba was "[o]bviously … working with the feds" and that task force officer Moore was affiliated with the FBI.

As the government argues, nothing in the record suggests that Elizondo learned anything material between the time he instructed Salgado to destroy or conceal evidence and the times he stated his knowledge or belief that the FBI was involved in the investigation of his activities. Although

Elizondo disagrees, he has not identified what he could have learned between instructing Salgado and speaking with Karczewski and Lopez that would have led to his conclusion the FBI was investigating him.

Evidence presented at trial supported each step in the inferential chain, so the jury could conclude that Elizondo foresaw a federal grand-jury proceeding when he instructed Salgado to destroy or conceal evidence. It was reasonable for the jury to infer that Elizondo's knowledge of the FBI's involvement arose from his previous experience as an FBI task force officer. The jury also could have reasonably inferred that Elizondo knew the FBI's use of a confidential source—and thus a federal grand-jury proceeding—were involved in the investigation at the time he instructed Salgado to destroy evidence. Drawing reasonable inferences and weighing evidence is the jury's province, so we affirm the denial of Elizondo's Rule 29 motion. *See Godinez*, 7 F.4th at 638–39, 642.

Even if we were to agree with Elizondo that the jury could not have reasonably inferred that he knew or suspected a federal grand-jury proceeding was in progress at the time he instructed Salgado, we would still affirm the denial of his motion for a judgment of acquittal. The obstruction statute does not require Elizondo to have had knowledge or a belief that a federal proceeding was pending when he told Salgado to destroy or conceal evidence.

Title 18 U.S.C. § 1512(f)(1) states, "[f]or the purposes of this section--an official proceeding need not be pending or about to be instituted at the time of the offense." Accordingly, the government must prove that a defendant believed his acts would "be likely to affect a pending or foreseeable proceeding." *Matthews*, 505 F.3d at 708; *cf. also United States v.*

*Pugh*, 945 F.3d 9, 22 (2d Cir. 2019) (§ 1512's "nexus requirement" is satisfied—and a federal grand-jury proceeding is foreseeable—when the defendant is aware he is the "target of an investigation"). The jury may not have concluded that Elizondo knew that there was an ongoing federal grand-jury proceeding when he instructed Salgado to destroy or conceal evidence. Rather, the jury may have determined that Elizondo believed a federal grand jury might be empaneled in the future and acted with the intent to prevent or impair such a proceeding. Nevertheless, the jury properly convicted him under the obstruction statute.

We expanded on § 1512's requirement of a foreseeable official proceeding in *United States v. Johnson*, 655 F.3d 594 (7th Cir. 2011). Scott Johnson was a large-scale cocaine dealer, and law-enforcement agents obtained search warrants and attempted to search his residence. *Id.* at 598–99. Johnson's girlfriend, Lisa Lamb, prevented the agents from entering the residence and disposed of large amounts of cocaine base before they could enter. *Id.* at 599. Lamb was charged with and convicted of obstructing justice under 18 U.S.C. § 1512(c)(1). *Id.* at 602–03. On appeal, she argued there was insufficient evidence to prove she believed her actions would affect a foreseeable official proceeding. *Id.* at 605.

In affirming, this court rejected the argument "that the government needed to prove that Lamb *knew* that her conduct would affect a particular official proceeding." *Id.* at 606. Given the language of 18 U.S.C. § 1512(f)(1), the government "simply needed to provide enough evidence that Lamb foresaw that the contraband might be used in an official proceeding and destroyed it with the intent of preventing that

use." *Id.* Because the evidence adduced at trial met that standard, the obstruction conviction stood. *See id.* at 606–07.

As in *Johnson*, here the government needed to present enough evidence that Elizondo foresaw that the items he instructed Salgado to destroy or conceal might be used in an official proceeding and that Elizondo instructed Salgado with the intent of preventing such use. The evidence—which established Elizondo's knowledge of federal grand-jury practices and his belief that the FBI was investigating him about 20 minutes after he last instructed Salgado—was more than adequate to permit such a conclusion.

*Johnson* does not require that Elizondo knew or even believed federal grand-jury proceedings were in progress when he gave Salgado the instruction. Although Elizondo argued that he ordered the destruction or concealment of evidence solely in anticipation of an internal CPD or state-level investigation, the jury "was not required, however, to accept [Elizondo's] version of events." *Id.* at 607. We therefore affirm Elizondo's conviction for obstruction on Count Four.

### D. Loss Calculation

The final issue for our consideration is the calculation of the intended loss for purposes of sentencing. At Elizondo and Salgado's sentencing hearings, the district court determined that the intended loss under U.S.S.G. § 2B1.1 was at least $6,500 but less than $15,000, which resulted in a two-level increase to each defendant's offense level. Defendants argue the district court's calculation was erroneous because it incorporated a portion of the $15,000 that government agents placed in the Maplewood apartment, which Elizondo and Salgado did not physically attempt to misappropriate. They

contend the intended loss is only complete at the time money is taken, and they did not take any of the $15,000 despite having the opportunity to do so.

We review a district court's calculation of the intended loss under U.S.S.G. § 2B1.1 for clear error. *United States v. Blake*, 965 F.3d 554, 558 (7th Cir. 2020). Under this standard of review, we will reverse "only if we are left with the definite and firm conviction that a mistake was made." *Id.* (quoting *United States v. Brown*, 880 F.3d 399, 409 (7th Cir. 2018)). To successfully appeal a district court's loss calculation, the defendant must show "that the district court's calculation was not only inaccurate but outside the realm of permissible computations." *United States v. Riley*, 493 F.3d 803, 810 (7th Cir. 2007) (citations omitted).

Commentary to § 2B1.1 clarifies that "'[i]ntended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1 App. Note 3(A)(ii). When a district court calculates the intended loss attributable to a defendant's conduct, it asks how many dollars the culprits' scheme put at risk. *United States v. Bonanno*, 146 F.3d 502, 509–10 (7th Cir. 1998). "Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose." *United States v. Mickens*, 453 F.3d 668, 672–73 (6th Cir. 2006) (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)). That is, § 2B1.1 holds a defendant accountable "for the full amount of the loss

he was prepared to inflict." *United States v. Strozier*, 981 F.2d 281, 285 (7th Cir. 1992).

Moreover, this court has rejected the argument that the amount of money a defendant intended a victim to lose cannot be included merely because the defendant has not completed the final step to expropriate funds. In *Strozier*, for instance, we refused to accept the defendant's argument that the intended loss attributable to his scheme was only the $36,000 he withdrew from a bank account rather than the full $405,000 he fraudulently deposited in that account. *Id.* at 283–85. We reasoned that the facts in that case supported the district court's conclusion that the defendant intended to spend the full $405,000 he deposited. *Id.*; *accord United States v. Sykes*, 357 F.3d 672, 675 (7th Cir. 2004) (adopting *Strozier*'s holding and reasoning); *United States v. Torres*, 209 F.3d 308, 311–12 (3d Cir. 2000) (same).

In concluding that the $6,500 threshold for the total intended loss was met, the district court found it was "overwhelmingly likely" that defendants intended to steal at least $3,000, or 20 percent, of the cash recovered from the apartment. The record supports the district court's finding by at least a preponderance of the evidence.

Inculpatory evidence was presented of the defendants' intent as to the cash at the apartment. The jury heard testimony that Elizondo and Salgado intended to steal funds from the Maplewood apartment. And the government played a recording at trial of Elizondo stating he did not take any of the cash recovered from the apartment solely because security cameras were located there. The district court saw and evaluated this evidence and concluded "it was clearly shown that there was an intention to take some of that money had

they not discovered the video cameras." The trial court
reasonably inferred, based on the details of the defendants'
scheme, that they intended to take at least $2,300 of the
$15,000.

At oral argument, Salgado's counsel disputed this finding,
contending that the defendants did not intend to steal money
recovered from the apartment regardless of whether they
discovered the cameras. This is shown by their decision to
continue working with Cuba after he led them to an
apartment equipped with surveillance cameras.[2] But that
contention ignores the government's explanation for the
defendants' decision to inventory the full $15,000, which is
that they believed the cameras belonged to the drug dealers
whose home they were purportedly raiding. Accepting that
explanation—as the district court was entitled to do, and to
which we must defer—it follows that Elizondo and Salgado
would have abandoned their plan to steal money from a
house where they believed drug dealers had recorded them.

Importantly, the defendants have not offered an
alternative theory to explain Elizondo's statement that it
would have been "a good Christmas for everybody" if the
officers had not discovered the cameras in the apartment.
Even if such a theory had been offered, no evidence of any
benign explanation was presented at either sentencing
hearing. To the contrary, Cuba's testimony was that he
understood Elizondo's statement to mean the officers would
have stolen some of the money and distributed a portion of
those proceeds to their informants. We "refuse to overturn the
district court's sentence on the basis of speculation in the

---

[2] Oral Argument at 15:55, 18:00.

valley of dreams." *Strozier*, 981 F.2d at 285. There was no clear error in the district court's factual finding that the government showed, by at least a preponderance of the evidence, that defendants intended to steal a portion of the cash at the Maplewood apartment.

Under the deferential standard of review that applies to a trial court's loss calculation, Elizondo and Salgado's argument must be rejected. Because the district court's factual findings were not clearly erroneous, it was entitled to account for the value of the funds that Elizondo and Salgado placed at risk by traveling to the Maplewood apartment and searching it with the intent to expropriate some of the cash that was placed there. Elizondo and Salgado's decision to abandon their plan once they discovered cameras in the apartment is not dispositive.

*            *            *

For these reasons, we AFFIRM Elizondo and Salgado's convictions and their sentences.